## MOBERLY *v.* HERBOLDSHEIMER

[No. 209, September Term, 1974.]

*Decided October 24, 1975.*

The cause was argued and reargued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Robert S. Paye*, with whom were *William H. Geppert* and *Geppert, McMullen & Paye* on the brief, for appellant.

Robert Herboldsheimer in proper person.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., and O'DONNELL, J., dissent and MURPHY, C. J., filed a dissenting opinion in which O'DONNELL, J., concurs at page 228 *infra*.

Appellee, Robert Herboldsheimer (Herboldsheimer), an Allegany County newspaper columnist, was desirous of ascertaining the salary of appellant, John A. Moberly (Moberly), as Director of Memorial Hospital of Cumberland, the corporate name of which is the Board of Governors of the Memorial Hospital of Cumberland (the Hospital), and certain other information relative to the Hospital. Accordingly, he sought to invoke the provisions of Maryland Code (1957, 1975 Repl. Vol.) Art. 76A, originally enacted by Chapter 698 of the Acts of 1970, relative to public information. The requested information was denied on the ground that the Hospital is not subject to the act. He then instituted an action in the District Court of Maryland. It was there held:

> "Under all of the conflicting circumstances, and the involved manner in which the Hospital exercises what authority it has, this Court is constrained to hold that it has not been shown that the Hospital is an agency of the City of Cumberland, within the purview of Article 76A, and that, therefore, the plaintiff is not entitled to the relief sought."

He appealed to the Circuit Court for Allegany County. It reversed and directed that the requested information be made available by Moberly as Director of the Hospital. We granted the writ of certiorari at the Hospital's request in order that we might address ourselves to the question of whether the Hospital is an agency of the City of Cumberland and thus covered by the act. We conclude that it is.

The Hospital, relying upon reasoning such as that put forward by Judge Chesnut in *Kerr v. Enoch Pratt Free Library*, 54 F. Supp. 514 (D. Md. 1944) rev'd 149 F. 2d 212

(4th Cir.), *cert. denied* 326 U. S. 721 (1945), and *Norris v. Mayor and City Council*, 78 F. Supp. 451 (D. Md. 1948), claims that it is not subject to control by public authority and thus is a private corporation. After the matter was initially argued before us we directed reargument with particular attention to be paid to Maryland Constitution Article III, § 48 which provides in pertinent part:

> "Corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes and except in cases where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created; and any act of incorporation passed in violation of this section shall be void."

We also directed attention to a provision exempting the Hospital from tort liability to which we shall later allude.

Chapter 411 of the Acts of 1927 authorized a bond issue in the amount of $500,000 by the Mayor and City Council of Cumberland. $400,000 of this issue was to be used "for the purpose of taking title to land and the erection or maintenance and operation of a public general hospital in or near the City of Cumberland, Maryland, to be known as the Memorial Hospital of Cumberland, Maryland, under the direction of the Board of Governors of said hospital as [t]hereinafter provided . . . ." The other $100,000 of that bond issue was to be paid to the Allegany Hospital of Sisters of Charity, Inc. For that reason the propriety of this bond issue was before the Court in *Finan v. M. & C.C. of Cumberland*, 154 Md. 563, 564, 141 A. 269 (1928), in which opinion Chief Judge Bond described Memorial Hospital as "a municipal hospital in Cumberland," although the status of Memorial Hospital was not before the Court.[1]

---

1. This opinion is not based upon such a foundation, however, it may be significant that the litigants at that time challenged the validity of that part of the bond issue destined for Allegany Hospital, called by this Court "a private eleemosynary corporation," but did not challenge the propriety of that part of the bond issue destined for Memorial Hospital. From this one could infer that they did not regard Memorial Hospital as an institution similar to Allegany Hospital.

Section 6 of the original act provided that "for the purpose of securing land and the erection of a suitable building and the maintenance and operation of said Memorial Hospital the Board of Governors of said Hospital [was] [t]hereby created." Five prominent citizens together with "the Mayor of the City of Cumberland and the President of the Board of County Commissioners of Allegany County [were to] comprise said Board." Its members, "with the exception of the said Mayor of Cumberland and the said President of the Board of County Commissioners of Allegany County [were to] retain office until they sh[ould] reach the age of sixty-five years or during good behavior." It was specified that the terms "of the Mayor of the City of Cumberland and the President of the County Commissioners of Allegany County as ex officio members of said Board [were to] be co-extensive with their respective term of office and no longer."

Under § 9 "said Board of Governors [was to] have power and [it was to] be its duty to make all rules and regulations deemed necessary from time to time for the operation and maintenance of said Hospital . . . ."

Section 13 of the original act stated "that the Mayor and City Council of Cumberland sh[ould] not be liable in any suit brought against it or by reason of the negligence of any employee, servant or agent engaged in and about the erection, maintenance or operation of said hospital."

At its next regular session the General Assembly again addressed itself to the matter of the Hospital. It then enacted Chapter 515 of the Acts of 1929. By that act § 6 was repealed and reenacted with amendments providing that the Board of Governors was "[t]hereby made and constituted a body politic and corporate by the name and style of the Board of Governors of the Memorial Hospital of Cumberland," by which name it was to "have perpetual succession," with the provision that it "sh[ould] be capable to sue and be sued, to have a common seal, and the same at its pleasure to alter and/or break . . . ." It was "to have all th⌐ powers [t]herein granted it, and all such other powers as sh[ould] be proper and necessary to operate and manage

said Hospital and/or a public general hospital, as fully as if incorporated for such purposes under the provisions of the Public General Laws of Maryland." No change was made in the Board named in the statute or in the provisions relative to the Board. A change was made in § 13 so that the Board of Governors was added to the exemption from tort liability.

Maryland Constitution (1851) Art. III, § 47 provided that "[c]orporations m[ight] be formed under general laws, but sh[ould] not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the object of the corporation c[ould] not be attained under general laws." Constitution (1864) Art. III, § 51 was to the same effect. However, Constitution (1867) Art. III, § 48, in addition to the language we quoted earlier in this opinion, as originally adopted provided that "as soon as practicable, after the adoption of th[at] Constitution, it sh[ould] be the duty of the Governor, to appoint three persons learned in the Law, whose duty it sh[ould] be, to prepare drafts of general Laws, providing for the creation of corporations, in such cases as m[ight] be proper, and for all other cases, where a general Law c[ould] be made . . . ." See the history of the Maryland general law as to corporations set forth in J. France, *Principles of Corporation Law* (2d ed. 1914) 27. The author points out that prior to the year 1838 the Vestry Act (Chapter 24 of the Acts of 1798) and the Religious Corporations Act (Chapter 11 of the Acts of 1802) "were the only steps taken in the direction of free incorporation." However, "[b]y the Act of 1838, ch. 264, persons desirous of obtaining charters for manufacturing purposes were permitted to incorporate under a general law." New purposes were added between 1838 and 1868 so that "at the latter date, the general incorporation law provided for associations of the following descriptions: Associations 'for any moral, scientific, literary, dramatic, agricultural or charitable purpose or for the purpose of forming any uniformed volunteer company, fire engine or hose company, land company, or beneficial, benevolent or musical society; cemetery companies; building associations; manufacturing companies; mining companies; religious societies; telegraph companies; companies for "obtaining oil

by boring or otherwise"; universities and colleges.' " Then, as the author puts it, "[w]ith the year 1868, a new order began." He further states:

> "§ 21. **Scope of the general law.** The plain intent of the Constitution was to reserve municipal and possibly banking corporations for special charters, and to dispense with the latter in 'all other cases where a general law can be made.' But this intent was not realized. In the first place, the legislatures succeeding that of 1868 did not, in broadening the scope of the general law, keep step with the need; and in the second place, the Court of Appeals decided that the grant of special powers to a corporation of a class covered by the general law, makes a special charter valid. The Act of 1908, in addition to permitting incorporation for any lawful purpose, annexes the right to obtain all proper powers. *Accordingly, the necessity for a legislative or special charter can rarely exist;* and one unnecessarily granted is void. The test of necessity is whether the results of the special act are obtainable under the general law." *Id.* at 28-29. (Emphasis added.)

We must be concerned here with this constitutional provision as applied to the act in question because of that familiar principle of law under which if there are two constructions that can be placed upon a constitutional provision, a statute, or an act of a public official, one of which will result in its legality and effectiveness and the other of which will make it illegal or nugatory, we must construe it so as to render it effective and so as to avoid conflict with the Constitution whenever that course is reasonably possible. *Davidson v. Miller,* 276 Md. 54, 344 A. 2d 422 (1975); *Acting Dir., Dep't of F. & P. v. Walker,* 271 Md. 711, 719, 720, 319 A. 2d 806 (1974); *District Land v. Wash. S. S. C.,* 266 Md. 301, 312, 292 A. 2d 695 (1972); and *Deems v. Western Md. Ry.,* 247 Md. 95, 113, 231 A. 2d 514 (1967). Accordingly, under the Constitution we must address ourselves to whether this corporation was validly created for

other than municipal purposes. If it was not, then it follows that it must have been created for a municipal purpose and hence it is an agency of the City of Cumberland, thereby bringing it within the purview of the public information sections of the Code.

The cases which have construed this constitutional provision have arisen, without exception, relative to corporations created prior to the extensive revision of the corporation law in 1908. It was the 1908 revision which was embodied in Code (1924) Art. 23, in effect at the time of the creation of this corporation.

In *Reed v. Balt. Trust & Guarantee Co.*, 72 Md. 531, 20 A. 194 (1890), a bill was filed to restrain the Baltimore Trust & Guarantee Co. from acting as assignee, trustee, receiver, executor, administrator, guardian, or in any other fiduciary capacity, under the orders or decrees of courts of record, as it was authorized to do under its charter. The bill charged that at the time of the incorporation of the company by a special act of the General Assembly a general law existed providing for the creation of trust companies. Our predecessors inquired as to whether "there [was] any general Act providing for a corporation with powers, rights and functions similar to those granted by the special Act to th[at] appellee." They observed that the answer was to "be found in stating some of the provisions of its charter relating to its trust powers," saying:

> "They are, 'that the corporation has power to accept and execute trusts of every description, which shall be entrusted to it by any person or corporation, or by the order of any court of record.
>
> " 'Any court shall have the power to appoint it guardian of an infant, or committee of a lunatic. Any court of any State may direct money lying in court awaiting distribution to be deposited with the company.' " *Id.* at 533.

Judge Briscoe stated for this Court that the corporation was "expressly authorized to act as executor, administrator, guardian, assignee, or receiver, and to collect the incomes of

estates, and take custody of wills and legal documents." Moreover, its charter further provided that when acting in such a fiduciary capacity its capital stock and its property as paid in should be taken and considered as the security required by law for the faithful performance of its duties, and no bond or other security should be required of it. It was made the legal depository for public funds. It was authorized to act as a safe deposit company, to form a board of arbitration, and to act as a public arbitrator. The Court said:

"It will at once be seen that there is no general law conferring such rights, or under which a company could have been formed with similar powers, as were granted by the special Act to this company; and it cannot be considered a corporation of the same general character as any corporation which could have been formed under the Act of 1876. There is no general provision for the formation of trust and deposit companies, or for a deposit company, under the general Incorporation Law of this State with powers similar to those granted to this company. Hence, there was no way by which such corporate rights and powers could have been conferred, except by a special Act of the Legislature. This court held in *Georgetown College v. Browne*, 34 Md. 450; *Build. Asso. v. Lowdermilk*, 50 Md. 175; *Ellicott Mach. Co. v. Speed* [72 Md.] 22, that a corporation could not act in the capacities of executor, administrator, guardian, trustee, etc., without express and special authority. A trust company, then, formed under the general incorporation laws of the State, for the purposes included within any of the twenty-one enumerated classes as provided by the Code, Art. 23 (Act of 1876), would be powerless to exercise such corporate powers and rights as were granted and conferred to this company by the special Act of the Legislature, because those special rights, powers and franchises could not be brought within the provisions of the general statute, or granted and

conferred under the general incorporation law of the State." *Id.* at 534-35.

The corporate charter of Title Guarantee & Trust Company was before the Court in *State v. Title Guar. & Tr. Co.*, 168 Md. 376, 177 A. 617 (1935). Its 1884 legislative charter, under a different name, empowered it to examine titles to property, to guarantee or to insure owners and mortgagees of real or leasehold property against loss by reason of defective titles, liens, or other encumbrances; and to guarantee and insure the fidelity of fiduciaries. This was enlarged in 1894 by authorization to it to have all the powers of a natural person to buy, sell, lease, or otherwise acquire and hold real and personal property, to lend money upon real or personal security, to borrow money for its corporate purpose, to receive money on deposit, to collect ground rents, interest on mortgages, dividends of all kinds, and to have the management and custody of all kinds of property upon such terms as it might arrange. At the same time the corporation was made subject to the terms of Chapter 109 of the Acts of 1892. It provided for the examination and report at stated times of trust, guaranty, loan, and fidelity companies, and the deposit of prescribed securities in a defined amount with the treasurer of the State for the protection of depositors. It also was made subject to Chapter 279 of the Acts of 1892, concerning corporations which might act in certain fiduciary capacities without bond, etc. The name of the corporation was changed to Title Guarantee & Trust Company by the Acts of 1900. The powers of the corporation were amended by Chapter 321 of the Acts of 1920 by conferring on the corporation all the powers given to trust companies under Art. 11 of the Code of 1912 or any additions or amendments to it. Judge Parke observed for our predecessors that "the legislation [was not] within the denunciation of sections 33 and 48 of article 3 of the Constitution, because the powers granted were either not obtainable under the general incorporation law then in force or were more extensive than by general statute provided."

Code (1888) Art. 23, § 14 provided that corporations might be formed "for any of the following purposes." Then

followed a number of sections listing 24 different classes of corporations. Section 14 of that article was § 14 of Chapter 471 of the Acts of 1868, the general corporation law of that year. The 1908 enactment replaced all of this.

Since 1908 perpetual existence of corporations has been permitted. The 1868 enactment limited the duration of corporations incorporated under its provisions, other than gas light companies, to 40 years. It was for this reason that the Court held in *Singer v. Wyman Memorial Assn.*, 138 Md. 398, 114 A. 50 (1921), that a special act of incorporation passed in 1884 which gave the corporation so created the power to perpetuate its existence was within the exception of Art. III, § 48.

The 1908 enactment followed the appointment of a commission to review the corporation law of Maryland. See 13 Trans. of Md. St. B. Ass'n 91-92 (1908) and J. Carter, *The Nature of the Corporation as a Legal Entity* 129 f.n. 187 (1919). Stevenson A. Williams, Esq., in his presidential address to the Maryland State Bar Association, observed:

> "[E]ach General Assembly has to devote a large part of its session, certainly one-fourth, to the consideration of [legislative charters]." 6 Trans. of Md. St. B. Ass'n 20 (1901).

Arthur W. Machen, Jr., Esq., in an address on corporation law, told the Maryland State Bar Association at its 14th annual meeting that, with the passage of the 1908 revisions, "for the first time [we were] enjoying the benefits of a statute which is not, to use the words of a well-known writer, a mere 'legal antique' or curio . . . ." See 14 Trans. of Md. St. B. Ass'n 80 (1909). In his conclusion he said, "[W]e are now by the Act of 1908 emancipated from the shackles of an antiquated law. We are enjoying the first taste of liberty." *Id.* at 98.

Code (1924) Art. 23, § 3, in effect at the time of the creation of this corporation, provided:

> "Corporations may be formed under the provisions of this article for any one or more lawful purposes, except such as are excluded from the

operation of a general law by the constitution of this State. And except where special provisions inconsistent herewith are made in this article for particular classes, all corporations shall be formed in manner following:"

referring to the succeeding sections of that article. A hospital of this type was not among the excluded purposes. Section 18 provided:

"In any case in which neither the charter nor the by-laws of a corporation having no capital stock, heretofore or hereafter incorporated, provides for members thereof as such, and in any case in which any such corporation has in fact no members other than the members of its governing body or board by whatever name they may be called, the members for the time being of its governing body or board shall, for the purposes of any statutory provision or rule of law relating to members of corporations having no capital stock, be taken to be the members of such corporation, as well as members of such governing body or board, and may meet as members of such corporation and exercise all of the rights and powers of members thereof."

Accordingly, the membership provisions of the special act creating the Hospital as a corporation do not bring that act within the exception contained in Constitution Art. III, § 48 relative to special acts, since those membership provisions were available under the general law.

The point is made by Moberly that "[t]he general corporation laws then in existence did not specifically provide for the creation of non-stock corporations for the purpose of operating non-profit general hospitals." This is true, but a specific provision was not necessary. For instance, we are told in *Stevens v. Emergency Hospital*, 142 Md. 526, 528, 121 A. 475 (1923), "that in the year 1906 . . . the Emergency Hospital of Easton, was incorporated under the general laws of the State, as appeared from its certificate of incorporation filed with the bill" of complaint in that proceeding.

We perceive and have been cited to no provision in the legislative charter of the Hospital here under consideration (including the provision for *ex officio* membership on the Board of Governors) that could not have been placed in the charter or by-laws or both of a corporation established under the general corporation laws. As a matter of fact, no special act was necessary to give either Allegany County or the City of Cumberland authority to erect a hospital since Code (1924) Art. 43, § 62, originally enacted as Chapter 155 of the Acts of 1882 and now codified as Code (1957) Art. 43, § 63, provided:

> "The municipal and county authorities may provide for the use of the inhabitants of their respective city, town or county hospitals . . . or two or more local authorities may combine in providing a common hospital."

It is possible that the provisions for exemption from tort liability were inserted to avoid any question as to whether the operation of the Hospital was a governmental function under which the municipal corporation would have no tort liability. *Baltimore v. State*, 173 Md. 267, 195 A. 571 (1937).[2] In *Thomas v. Prince George's County*, 200 Md. 554, 92 A. 2d 452 (1952), Chief Judge Markell said for this Court:

> "No case in this court has directly held that operation of a hospital is a governmental function in respect of which a municipality is not liable for

---

2. Critics of the doctrine of stare decisis as applied to the doctrine of sovereign immunity in this State, *see, e.g.* Clarke, *Municipal Responsibility in Tort in Maryland*, 3 Md. L. Rev. 159 (1939), often overlook the fact that in Maryland "[t]he right to sue the State was given by the Act of 1786, ch. 53, but this was afterwards repealed and the right taken away." State v. Baltimore & O.R.R., 34 Md. 344, 374 (1871). This repeal came by Chapter 210 of the Acts of 1820. State v. Wingert, 132 Md. 605, 611, 104 A. 117 (1918). Section 9.08 of the proposed Constitution of 1968 provided:

> "Sovereign immunity may not be pleaded as a defense in a suit against the State or any unit of local government, or any of their departments or agencies, except to the extent and in the manner prescribed by law."

Some will recall the presence of this provision as one of the reasons advanced by some critics for rejecting that proposed Constitution.

negligence. Perhaps it has been assumed by litigants that a municipality is no more liable than a charitable corporation. In at least two cases in this court, operation of a hospital is mentioned as an illustration of just such a governmental function. *Baltimore v. State, use of Blueford,* 173 Md. 267, 275, 276, 195 A. 571; *Harford County v. Love,* 173 Md. 429, 434, 196 A. 122." *Id.* at 559.

Section 11 of the 1927 Act, now codified as Code of Public Local Laws (1930) Art. 1A ("City of Cumberland"), § 159 and as Cumberland City Code (1966) § 197, stated that the Board of Governors "sh[ould] not have authority, without the consent of the Mayor and City Council of Cumberland, to make any addition [to the Hospital], or increase the capital account thereof, unless such addition or increase of capital account sh[ould] be by donation of individuals to said Board of Governors." It further provided that "[i]f, in the opinion of the Board of Governors, there sh[ould] be an amount of money in excess of such amount as m[ight] be needed in the operation and maintenance of said Hospital, such amount in excess thereof sh[ould] be paid by said Board of Governors to the Trustees of the Sinking Fund of the City of Cumberland for the purpose of retiring bonds under th[at] issue, and in the event that a deficit sh[ould] be found to exist in such operation and maintenance, the Mayor and City Council of Cumberland sh[ould] have the power to appropriate to the purposes of said Hospital such amount so deemed necessary." By § 198 of the present Cumberland City Code (Art. 1A, § 160) (a part of the original enactment) the Hospital Board is to furnish to the Mayor and City Council "at the end of each six months a statement showing the receipts, disbursements and general financial condition of said Hospital."

Section 15 of the 1927 Act and § 2 of the 1929 Act, codified as present Cumberland City Code, § 201, repealed "[a]ny and all Acts or parts of Acts, or any part or parts, of the City Charter of Cumberland, Maryland, conflicting in any way [with those enactments] . . . in so far and to the extent that the same sh[ould] so conflict."

A survey of the enactments relative to the Hospital, including, specifically, the statements relative to the relationship of the Hospital to the City of Cumberland and the fact that each time the matter of the Hospital was before the General Assembly specific action was taken to repeal all parts of the charter of the City of Cumberland inconsistent with those enactments, leads to the conclusion that the Hospital is in fact an agency of the City of Cumberland. When to those enactments is added the fact that the legislative charter of the corporation contains no power that could not have been provided a private corporation under the general corporation laws of the State, and, therefore, under Art. III, § 48 the charter can only be valid if it is one for municipal purposes, the conclusion is inescapable that this Hospital is an agency of the City of Cumberland and, therefore, subject to the public information law.

Herboldsheimer sought to ascertain the salary of the Director and the amount of the legal fees paid to the law firm which represents the Hospital. The trial judge (Rutledge, J.) said in his opinion:

"Having determined that the hospital is an agency of the City of Cumberland, the second issue is whether the information sought comes under any of the exceptions in the Statute.

"(II.) The defendant contends that under the exception of 'personnel records' should be included the matter sought, i.e., the salary of the superintendent and the amount paid by the hospital for legal services.

"It should be noted that where 'Public Records' was defined in Article [76A] Section 1 (a) in 1970, it provided,

'The term "public records" when not otherwise specified shall include any paper, correspondence, form, book, photograph, photostat, film, microfilm, sound recording, map drawing, or other document, regardless of physical form or characteristics, and including

all copies thereof, that have been made by the State and any counties, municipalities and political subdivisions thereof and by any agencies of the State, counties, municipalities, and political subdivisions thereof, or received by them in connection with the transaction of public business, except those privileged or confidential by law.'

"As if this definition left some doubt and confusion, in 1973 a clarifying amendment was added, saying,

'The term "public records" also includes the salaries of all State employees, both in the classified and nonclassified service, and all county and municipal employees, whether in a classified or nonclassified service.'

"It is clear that the thrust of this amendment was in the direction of the modern trend to require financial disclosures and end invidious shadows of secrecy.

"Nor does the Court agree with the contention that the fee paid to its attorney by the hospital is a privileged transaction because it is a confidential matter, under the attorney-client relationship.

"M.L.E. 23, *Witnesses*, Sec. 53 (1962) says, 'Confidential communications, communicated in the course of professional employment between an attorney and his client, may not, without the consent of his client, be divulged by the attorney. The privilege is that of a client and not of the attorney and is designed to secure the client's confidence in the secrecy of his communication.'

"The communication by the client to the attorney is privileged, not the fee which the lawyer charges the client.

"(III) Finally, it is contended by the defendant that even if Art. 76A applies, and the matter does not come within one of the exceptions, yet under

Article 76A Sec. 3 (f) 'it is provided that where disclosure would do substantial injury to the public interest — a defendant custodian may apply to the district court — for an order permitting him to restrict such disclosure.' [3]

\* \* \*

"The defendant contends that the newspaper in which the plaintiff's column appears has long carried out a vendetta with Mr. Moberly and the hospital, and desires the information requested for the purpose of exposing or attempting to expose the Director, hospital and staff to ridicule, and seeks to examine the hospital records only for the purpose of attempting to find something for the pruriency of curious ears. The defendant filed 183 articles from The Peoples Guardian (which later became The Guardian) to prove its point.

"The Court does not find it necessary to decide motives. If the hospital is a public institution, and the information sought does not come under one of the exceptions, the information sought should be made available.

"The Court does not find that invidious or improper motives, if any, can bring information otherwise revealable under the Act into the classi-

---

**3.** This cause had its origin in the District Court in August, 1973. Prior to the repeal and reenactment of this statute by Chapter 216 of the Acts of 1974, the provision in § 3 (e) for enforcement was by application "to the district court of the district wherein the record is found . . . ." It is obvious that this statute was copied from an enactment elsewhere without adequate editing. One reaches this conclusion from reading this section and § 3 (a) (iii) stating that there was no right of inspection if "[s]uch inspection is prohibited by rules promulgated by the supreme court . . . ." Constitution Art. IV, § 41A providing for the District Court of Maryland was not ratified by the people until November 3, 1970. Chapter 216 of the Acts of 1974 changed the reference in "supreme court" to "Court of Appeals," the provision in § 3 (e) relative to an application for enforcement "to the district court of the district wherein such record is located" to "circuit court of the county where the record is found," and the provision in § 3 (f) from "the district court of the district in which such record is located" to "circuit court of the county where the record is located."

fication of Art. 76A 3. (f) where disclosure would do 'substantial injury to the public interest.' "

We adopt that opinion. If the General Assembly did not intend this interpretation when it enacted this far reaching statute, it should so state.

*Order affirmed; appellant to pay costs.*

*Murphy, C. J. dissenting:*

The majority concludes that the corporation known as the Board of Governors of the Memorial Hospital of Cumberland (the Hospital) is an agency of the City of Cumberland; it reasons that there is no provision in the Hospital's legislative charter that could not have been included in the charter of a corporation established under the general corporation laws and, therefore, under Art. III, § 48 of the Maryland Constitution, the charter can only be valid if it is one for municipal purposes. In my opinion, however, Chapter 411 of the Acts of 1927 created a private corporation with a governing body not obtainable under the general incorporation laws, viz., a board which included two governmental officials, each serving in an ex-officio capacity. No provision existed in the general law for the appointment of such governmental officers as ex-officio board members. The general law in effect when the Board was created provided that corporations were to "be formed in manner following." Code (1924) Art. 23, § 3. The "manner" referred to in § 3 is delineated in the remainder of Art. 23, but nowhere is there found support for the proposition that the type of ex-officio board memberships mandated by the Legislature in creating the Hospital corporation could be achieved under the general corporation law. It has been held that matters in the incorporation papers, which are not warranted by law, are of no effect and may be treated as surplusage. *State v. Penn-Beaver Oil Co.*, 34 Del. 81, 143 A. 257 (1926). In my view, the provision in the Hospital's charter for the ex-officio membership on the governing board of the Mayor and President of the County

Commissioners was not responsive to any specification in the general law and could not have had any force and effect absent the special act. The majority reads the general law in 1927 as permitting the inclusion in the charter of anything not specifically forbidden by law. But while the general law did permit incorporation for any *purpose* not forbidden, it still required every aspect of the corporate formation to correspond to and be consistent with the statute, and ex-officio membership of governmental officers was not provided for by the Code. Had there been no special act the provision would have had no claim to the dignity and effectiveness of a charter regulation. I therefore conclude that the special act was necessary to create the board mandated by the Legislature in Chapter 411 of the Acts of 1927. Consequently, Section 48 of Art. 3 of the Constitution of Maryland should play no part in determining whether the Hospital is a municipal agency of the City of Cumberland.

Had the Court properly discounted the relevance of incorporation by special act, it would have concluded that the Hospital is not a municipal agency or instrumentality. As the majority points out, the Hospital was created by Chapter 411 of the Acts of 1927. It was there provided that the Mayor and City Council of Cumberland was authorized to expend up to $400,000 of bond proceeds for the purpose of taking title to land and erecting a hospital under the direction of a Board of Governors. Section 6 of the Act created a Board of Governors consisting of seven members, two of whom were ex-officio. As to the individual Governors named, the Board was self-perpetuating in that it was authorized to fill vacancies which occurred among the general members. The Board was empowered to select the land for the hospital, title to which was to be in the name of the Mayor and City Council of Cumberland and it was to select plans for the building and enter into contracts for the erection and equipping thereof. Under Section 9 of the Act the Board was given the power to make rules and regulations for the operation and maintenance of the hospital. The Board was empowered under Section 10 to regulate charges, salaries, and to hire employees. Section 11 of the Act *authorized* (but did not require) the Mayor and

City Council to appropriate amounts necessary to cover deficits in operation and maintenance of the hospital.

By Chapter 515 of the laws of 1929, the provisions of Chapter 411 of the Acts of 1927 were amended; the Board was thereby "made and constituted a body politic and corporate," given perpetual succession, and the capacity to sue and be sued. In addition, the Board was granted all powers necessary and proper to operate and manage a hospital "as fully as if incorporated for such purposes under the provisions of the Public General Laws of Maryland."

The distinction between public and private corporations is one of long standing. A comprehensive review of the Maryland authorities is to be found in the case of *Kerr v. Enoch Pratt Free Library*, 54 Fed. Supp. 514, 523:

> "The legal test between a private and public corporation is whether the corporation is subject to control by public authority, state or municipal. To make the corporation a public one, its managers, whether trustees or directors, must be not only appointed by public authority but *subject to its control*. This has been the Maryland law since the early case of Regents of University of Maryland v. Williams, 9 Gill & J., Md., 365, 31 Am. Dec. 72 (dealing with the University of Maryland prior to its reorganization in 1920 when it became for the first time a governmental institution), and in the similar well known case of Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 671, 4 L. Ed. 629, it was said:
>
> > 'When [a] corporation is said at the bar to be public, it is not merely meant, that the whole community may be proper objects of the bounty, but that the government have the sole right, as trustees of the public interest to regulate, control, and direct the corporation, and its funds, and its franchises at its own good will and pleasure.'
>
> "And this test has been reaffirmed and applied in

subsequent cases. St. Mary's Industrial School v. Brown, 45 Md. 310; Clark v. Maryland Institute, 87 Md. 643, 41 A. 126; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706 (dealing with the University of Maryland after its reorganization in 1920), and the general law on the subject is to the same effect. 18 C.J.S., Corporations, § 18, p. 394 et seq.; Fletcher, Cyc. Corp. Vol. I, p. 194 et seq." (Emphasis in original.)

Applying the "control" test in the present case, it is clear that the ex-officio board membership of the Mayor does not give the City of Cumberland sufficient control over the Hospital to constitute it a public corporation. The Board is self-perpetuating so that its actions cannot be effectively controlled by the City. It is authorized by the act creating it to manage its own internal affairs, independent of government control, and it is entirely separate from and independent of the City in its corporate acts and control. No obligation exists between the Hospital and the City to discharge a municipal function. The fact that the Hospital's construction funds were provided by a City bond issue does not alone make the Hospital a public corporation. It frequently occurs, of course, that private corporations are financially aided by governmental bodies where the public interest is involved in the appropriation. The income of the Hospital is derived from patient fees, appropriations from the State of Maryland for the care of indigent patients, and from bequests. Nor does it appear from the record that the City has ever appropriated operating funds for the Hospital. The City does not include the Hospital in its budget, and it is powerless to change a decision made by the Hospital's Board. I believe, therefore, that the Hospital is a private corporation and that appellee's request for information under Article 76A was properly denied.

I am authorized to say that Judge O'Donnell joins in the dissent.